UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | |
| | : | |
| BENJAMIN ROLLINS, | : | |
| | : | |
| Debtor | : | Case No. 06-52058 RFH |
| | : | |

BEFORE

ROBERT F. HERSHNER, JR.
CHIEF UNITED STATES BANKRUPTCY JUDGE

COUNSEL:

| | |
|---|---|
| For United States Trustee: | Mr. Robert G. Fenimore |
| | 440 Martin Luther King Jr. Boulevard |
| | Suite 302 |
| | Macon, Georgia 31201 |
| | |
| For Benjamin Rollins: | Ms. Lisa Williams |
| | Mr. Robert O. House |
| | 433 Cherry Street |
| | Suite A |
| | Macon, Georgia 31201 |

## MEMORANDUM OPINION

Felicia S. Turner, United States Trustee for Region 21, Movant, filed on

January 23, 2007, a Motion To Dismiss Pursuant To 11 U.S.C. Section 707(b)(1)

Based On Abuse Arising Under 11 U.S.C. Section 707(b)(3).  Movant's motion came

on for an evidentiary hearing on April 3, 2007.  The Court, having considered the

evidence presented, the stipulation of facts, and the arguments of counsel, now

publishes this memorandum opinion.[1]

Benjamin Rollins, Debtor, is single, has no dependents, and is about 28 years

old.[2]  Debtor has a bachelor's degree in English and a master's degree in secondary

education.  Debtor is currently working on his dissertation for a Ph.D. degree.

Debtor obtained his first credit card in 1996 when he was 18 years old.  When

he graduated from college, Debtor had four credit cards with a total balance of some

$15,000.

Debtor had a total of twelve credit cards by 2001.  Debtor testified that he met

his credit card obligations from 1996 until September of 2006.  Debtor testified that

he was never late on a monthly payment and that he made the minimum monthly

---

[1] There are some small differences in the amount of Debtor's obligations as
reported on Debtor's bankruptcy schedules, the stipulation of facts, and Debtor's
testimony at the evidentiary hearing.  The differences do not affect the Court's
decision.

[2] Debtor testified that he was 18 years old in 1996.

2

payments until September of 2006.  Debtor's credit report dated July 30, 2006,[3] lists

thirty credit accounts, all in "good standing" with the notations "Never late."  The

accounts include Debtor's credit cards and other credit accounts.

Debtor married and divorced in 2004.  Debtor testified that he "inherited"

some $10,000 to $15,000 in credit card obligations because of the divorce.

In October of 2004, Debtor leased a 2005 BMW vehicle.  The lease payments

were $377 per month.  Debtor's Statement Of Financial Affairs shows that he earned

$30,000 in 2004.[4]

During the first part of 2006, Debtor was employed as a part-time professor at

Kennesaw State University in Kennesaw, Georgia.  Debtor's gross annual income

was $16,000.  Debtor commuted to his job from an apartment he shared with a friend

in Carrollton, Georgia.  Debtor's share of the monthly rent was $300.  Debtor used

his credit cards to help pay his living expenses while working part-time at Kennesaw

State University.

Debtor was unable to find a full-time teaching position at a college.  Debtor

testified that the job market is saturated for English professors with Ph.D. degrees.

In March of 2006, Debtor applied to and was hired by Mount de Sales

Academy, a private school in Macon, Georgia.  Debtor was hired to teach high school

---

[3] Stipulation of facts, pp. 30-47, Docket No. 27.

[4] Movant and Debtor agreed that the Court could consider Debtor's bankruptcy
schedules and Statement of Financial Affairs.

3

English classes. Debtor's employment was to begin in August of 2006.

Also in March of 2006, Debtor and his girlfriend went on a cruise to Cozumel, Mexico. The cruise was paid for by his girlfriend's family. While in Cozumel, Debtor purchased a diamond ring for $7,890, using his CitiCard credit card. Debtor intended to sell the ring for a profit to a friend. Without Debtor's knowledge, the salesperson switched the $7,890 ring for a lesser quality ring. Debtor did not realize what had happened until after he boarded the cruise ship. Debtor was not able to return to the jewelry store. After he returned home, Debtor contacted the cruise line, the jewelry store in Cozumel, and CitiCard in an attempt to obtain a refund. Debtor's efforts were not successful. Debtor's friend refused to purchase the lesser quality ring. In late July or early August of 2006, Debtor's mother sold the ring to a third party and Debtor received $1,200. Debtor's obligation on his CitiCard account of $7,799.36 was paid by balance transfers from Debtor's other credit cards.

Debtor's employment at Kennesaw State University ended in May of 2006. Debtor began searching for housing in Macon, Georgia. Debtor wanted something that would be close to his new job at Mount de Sales Academy. Debtor looked at some downtown loft apartments. The monthly rent was between $800 to $900. Debtor also looked at some cheaper apartments but was concerned about safety. Debtor decided to purchase a house rather than to lease an apartment.

In June of 2006, Debtor purchased a two-bedroom house. Debtor testified that

4

this was the cheapest house that he was shown by his real estate agent.  The house is less than one mile from Debtor's job at Mount de Sales Academy.  Debtor obtained 100% financing for the purchase price of $144,500.  Debtor made no down payment.  Debtor's mortgage payments are $1,040 per month.  His property tax and homeowner's insurance total an additional $240 per month.  Debtor testified that he did not know the amount of the mortgage payment until a week before the closing.  Debtor testified that the estimated mortgage payment had been $800 to $964 per month.

Debtor earned $1,450 in June of 2006 by grading papers for an education testing service.

Debtor began teaching at Mount de Sales Academy in August of 2006.  Debtor received his first pay check on August 31, 2006.  Debtor's gross monthly salary is $4,000.  His monthly take home pay is $3,221.  Thus, Debtor's annual income increased from $16,000 in May of 2006 to $48,000 in August of 2006.

Debtor had been leasing a 2005 BMW since October of 2004.  The monthly lease payments were $377.  The balance owed under the lease was $32,000.  Debtor decided that it made financial sense to purchase an older, less expensive vehicle.

In late August or early September of 2006, Debtor purchased a 2003 BMW for $23,000.  HSBC Auto Finance financed the purchase.  Debtor's monthly payments were $577.  Debtor testified that his monthly payments on the 2003 BMW were

5

higher than the lease payments on the 2005 BMW, but that he would pay less in the long term. Debtor discovered that the 2003 BMW had mechanical problems. Debtor made no monthly payments on the 2003 BMW. Debtor's obligation on this vehicle was $23,500 as of October 23, 2006.

In September of 2006, Debtor purchased another 2003 BMW for $28,000. This second 2003 BMW was to be a replacement for the first 2003 BMW. Capital One Auto Finance financed the purchase of the second 2003 BMW. When he purchased this vehicle, Debtor believed the monthly payments would be $650. Debtor later learned that the payments would be $700. Debtor made no monthly payments on the second 2003 BMW. Debtor's obligation on this vehicle was $27,000 as of October 23, 2006.[5] Auto insurance on this vehicle was $215 per month.

In September of 2006, Debtor contacted an attorney for credit counseling to "explore his options." Debtor made a list of his assets and liabilities and realized that his liabilities exceeded his assets. Debtor received a pre-bankruptcy credit counseling briefing[6] on September 29, 2006. This briefing was received over the Internet using a computer in the office of Debtor's attorney.

---

[5] Stipulation of facts, pp 2-3. The evidence does not show why the obligation as of October 23, 2006, was less than the purchase price as Debtor made no monthly payments.

[6] 11 U.S.C.A. § 109(h) (West Supp. 2007). With certain exceptions, individuals must receive a credit counseling briefing prior to filing for bankruptcy relief.

Debtor filed a petition under Chapter 7 of the Bankruptcy Code on October 23, 2006. Debtor's obligations are primarily consumer debts.

Debtor had possession of three BMW vehicles when he filed for bankruptcy relief.[7] Debtor has surrendered the 2005 BMW and the first 2003 BMW that he purchased. Debtor intends to surrender the second 2003 BMW. Debtor is using a 2003 Ford Mustang that is owned by his girlfriend's father. Debtor testified that he will begin paying $350 per month to use the Mustang. Debtor does not know if this payment includes auto insurance.

Debtor made a total of 171 purchases totaling some $18,000 on three credit cards during the four months prior to his filing for bankruptcy relief. Debtor testified that the frequency and type of charges were "historically common behavior" for him. Debtor testified that he understood that charges made just prior to his bankruptcy filing may not be dischargeable.

Debtor made balance transfers totaling some $19,000 between various credit cards in July and August of 2006. Debtor testified that he researched the interest rates offered by various credit cards. Debtor transferred balances to take advantage of the best rates.

Debtor obtained a Discover credit card in December of 2001.[8] The credit limit

---

[7] Schedule B - Personal Property; Schedule D - Creditor's Holding Secured Claims; Schedule G - Executory Contracts And Unexpired Leases.

[8] Stipulation of facts, pp. 5, 24, 34.

was $9,700. The balance on June 13, 2006, was $5,615.99. Debtor made fifty-five

charges on the card totaling $3,950 between June 28, 2006, and August 10, 2006.

The balance on the Discover card on August 13, 2006, was $9,847.60. Debtor

charged $609.50 on June 28, 2006, to purchase a mattress for his mother who was

coming to live with him. Debtor's mother lived with him for about one month and

then moved out. Debtor charged $900 on June 28, 2006, to pay for three months

"past due" rent on his apartment in Carrollton, Georgia. Debtor charged $270.30 on

July 8, 2006, to purchase a "scratch and dent" chest to use in his house in Macon.

Debtor testified that the closets in his house are very small. Debtor charged $236.86

on July 14, 2007, to purchase a brief case. Debtor incurred an "over limit fee" of

$39.00 on August 13, 2006.

Debtor obtained a MBMA credit card in October of 2005.[9] The credit limit

was $19,500.[10] The balance on July 21, 2006, was $13,755.12. Debtor made forty-

six charges on the card totaling $5,877 between July 21, 2006, and September 18,

2006. Debtor charged $590 on September 15, 2006, to pay his electric bill. Debtor

testified that this was for current and past electric service. This charge made the

balance on the credit card exceed the credit limit. The MBMA card balance on

October 20, 2006, was $20,090.64.

---

[9] Stipulation of facts, pp. 4, 14, 36.

[10] The Stipulation of facts states that the credit limit was $19,000. The credit
card's monthly statement states that the credit limit was $19,500.

Debtor obtained a CitiCard credit card in January of 2004.[11]  The credit limit was $8,000.  The balance on September 20, 2006, was $148.92.  Debtor made seventy charges on the card totaling over $7,000 between September 29, 2006, and October 23, 2006.  Most of the charges were for small amounts that appear to be for food, fuel, and other living expenses.  Debtor charged his auto insurance and electric bills.  Debtor charged $652.66 on September 28, 2006, to purchase a ring.  Debtor returned the ring on October 9, 2006, and received a credit on his credit card.  Debtor charged $394.94 on September 29, 2006, to purchase a rug to cover the wood floor in his house.  Debtor charged $634.83 on September 30, 2006, to purchase a "scratch and dent" computer desk.  Debtor uses the desk when he grades papers and enters the grades into his computer.  Debtor charged $331.90 on October 21, 2006, for prescription hair-loss medicine.  Respondent charged $184 on October 22, 2006, for a haircut.  Debtor charged $562.82 on October 23, 2006, to purchase tires for his second 2003 BMW.

Debtor lists the following obligations in his bankruptcy schedules:

| Secured Debt | Amount |
|---|---|
| House | $ 144,500 |
| 2003 BMW (second) | 27,000 |

---

[11] Stipulation of facts, pp. 3, 8, 33

9

| | | |
|---|---|---|
| 2003 BMW (first) | 23,500 | |
| | | $ 195,000 |

| Unsecured Debt | | |
|---|---|---|
| Twelve credit cards | $ 70,000[12] | |
| Other obligations | 14,267 | |
| Student loan | 10,547 | |
| | | $ 94,814 |
| TOTAL DEBT | | $ 289,814 |

Debtor's amended schedules of current income and current expenditures list his income and expenditures as follows:

| | Monthly Amount |
|---|---|
| Gross Income | $ 4,000 |
| Take Home Pay | 3,221 |
| Expenditures | 2,839 |
| Excess | 382 |

Debtor's amended schedule of current expenditures lists $300 for transportation and $215 for auto insurance. Movant objects to these expenditures because Debtor intends to surrender the second 2003 BMW that he purchased.[13]

---

[12] Debtor testified that his credit card obligations totaled about $70,000. See also Stipulation of facts, p. 3, # 12.

[13] Debtor testified that he still has possession of the second 2003 BMW.

10

Debtor testified that he needs a vehicle and that he will begin paying $350 per month to use a Ford Mustang that is owned by his girlfriend's father.  Debtor does not know whether this payment includes auto insurance.  The Court is persuaded that Debtor will need a vehicle and that his monthly auto expenses including fuel will be about $515.

Debtor incurred a number of obligations during the four months prior to filing for bankruptcy relief on October 23, 2006.  These obligations include the following:

| | | |
|---|---|---|
| Credit Cards | | |
| Purchases | $ | 18,000 |
| Balance Transfers | | 19,000 |
| | | |
| House | $ | 144,500 |
| | | |
| Vehicles | | |
| 2003 BMW (first) | $ | 23,000 |
| 2003 BMW (second) | | 28,000 |
| TOTAL | $ | 232,500 |

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") became effective, in relevant part, on October 17, 2005.  Debtor's bankruptcy petition was filed on October 23, 2006, and is governed by BAPCPA.

Movant contends that Debtor's Chapter 7 case should be dismissed pursuant to

section 707 (b)(1) and (3) of the Bankruptcy Code.  This section provides in part:

### § 707.    Dismissal of a case or conversion to a case under chapter 11 or 13

. . .

   (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

. . .

   (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—

   (A) whether the debtor filed the petition in bad faith; or

   (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C.A. §707 (b)(1), (3) (West Supp. 2007).

Debtor's "current monthly income"[14] is less than the median income for a one person household in Georgia.[15]  Therefore Debtor's bankruptcy filing is not presumed to be an abuse for purposes of section 707(b).  11 U.S.C.A. § 707(b)(2)(A)(i),(7) (West Supp. 2007).

Movant relies upon section 707(b)(3) of the Bankruptcy Code which provides grounds for finding abuse when the presumption of abuse does not arise under section 707(b)(2)(A).  Movant contends that Debtor filed his bankruptcy petition in bad faith.  Movant also contends that granting Chapter 7 relief would be an abuse under the totality of the circumstances.

Courts look to pre-BAPCPA case law in construing bad faith and the totality of the circumstances under BAPCPA.  In re Henebury, 361 B.R. 595 (Bankr. S.D. Fla. 2007); In re Mestemaker, 359 B.R. 849 (Bankr. N.D. Ohio 2007); In re Pak, 343 B.R. 239, 243 (Bankr. N.D. Cal. 2006);  In re McIvor, 2006 WL 3949172, p. 4 (Bankr. E.D. Mich. Nov. 15, 2006).

The totality of the circumstances factors include:

(1)  Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2)  Whether the debtor incurred cash advances and

---

[14] 11 U.S.C.A. § 101(10A) (West Supp. 2007).

[15] See 11 U.S.C.A. § 707(b)(6) (West Supp. 2007).  Only the judge or United States trustee may file a motion alleging an abuse under section 707(b) if the debtor's current monthly income is less than the applicable median family income.

made consumer purchases far in excess of his
ability to repay;

(3)    Whether the debtor's proposed family budget is
excessive or unreasonable;

(4)    Whether the debtor's schedules and statement of
current income and expenses reasonably and
accurately reflect the true financial condition; and

(5)    Whether the petition was filed in good faith.

See In re Nockerts, 357 B.R. 497, 506 (Bankr. E.D. Wis. 2006).

Most courts also consider the debtor's ability to fund a Chapter 13 plan.  In re

Pak, 343 B.R at 244 (debtor's actual ability to repay nonpriority unsecured debts may

be considered under totality of circumstances); In re Mestemaker, 359 B.R. at 855-56

(totality of circumstances includes debtor's financial situation);  In re Henebury, 361

B.R. at 607 (ability to pay warrants dismissal under totality of circumstances);  In re

Paret, 347 B.R. 12, 15 (Bank. D. Del 2006) (ability to pay is part of totality of

circumstances).

In In re Payne,[16] a pre-BAPCPA case, the United States trustee contended that

granting Chapter 7 relief to the debtor would be a substantial abuse under former 11

U.S.C.A. § 707(b).  The court stated that "virtually all courts to consider the issue [of

substantial abuse] look at the totality of the circumstances."  The court stated:

Factors courts have considered in the totality of
circumstances analysis are varied and include the

---

[16] 2005 WL 4979063 (Bank. M.D. Ga. June 10, 2005) (Walker, J.).

14

following: (1) whether the debtor filed his bankruptcy
petition in good faith; (2) whether the filing was
precipitated by an unseen catastrophic event, such as a
sudden illness or unemployment; (3) whether the
schedules reasonably and accurately reflect the debtor's
financial condition; (4) whether the debtor made
significant purchases on the eve of bankruptcy; (5)
whether the debtor incurred cash advances or made
consumer purchases far exceeding his ability to repay
them; (6) the period of time over which the debts were
incurred; (7) whether the debtor's proposed budget is
excessive or unreasonable; (8) the impact of the
bankruptcy filing on the debtor's standard of living; (9)
the debtor's age, health, number of dependants, and
family responsibilities; (10) whether the debtor made any
efforts to repay the debts or negotiate with creditors; (11)
whether the debtor could provide a meaningful
distribution in a Chapter 13 case; (12) whether the
debtor's expenses could be reduced significantly without
depriving him and his dependants of necessities.

See In re Woodhall, 104 BR. 544 (Bank. M.D. Ga. 1989) (Hershner, J.).

The Court will now apply the totality of circumstances factors to the facts in

the case at bar.

(1) Whether the debtor could fund a Chapter 13 plan which would pay a meaningful
portion of the unsecured claims.

Debtor's amended schedules show that he has $382 in excess monthly income.

Debtor could pay some $13,752 into a Chapter 13 plan over a term of thirty-six

months.

Debtor schedules his monthly housing expenditures as $1,280.  Prior to

15

moving to Macon, Debtor was leasing an apartment. Movant argues that Debtor

should have leased an apartment in Macon rather than purchasing a house. The Court

is not persuaded that Debtor made an unreasonable decision in deciding to buy a

house rather than lease an apartment.

(2) Whether the bankruptcy was filed as a consequence of illness, disability,
unemployment, or some other calamity.

There is no evidence that Debtor experienced an illness, disability,

unemployment, or other calamity. In fact, Debtor's annual income increased

substantially from $16,000 in May of 2006 to $48,000 in August of 2006.

(3) Whether the debtor made significant purchases on the eve of bankruptcy.

In September of 2006, Debtor contacted an attorney to "explore his options."

Debtor received a pre-bankruptcy credit counseling briefing on September 29, 2006.

Debtor filed for Chapter 7 relief on October 23, 2006. Debtor did not change his

"historically common [spending] behavior" after he met with his attorney. Debtor

made seventy charges totaling over $7,000 on his CitiCard credit card between

September 29, 2006, and October 23, 2006. Debtor made nine charges totaling

$1,269.23 on the day before and on the day that he filed for bankruptcy relief.

(4) Whether the debtor's proposed budget is excessive or unreasonable.

16

Debtor filed on April 2, 2007, an amended schedule of monthly expenditures.

Movant objects to Debtor's expenditure for transportation ($300) and auto insurance

($215) because Debtor intends to surrender his 2003 BMW vehicle.  The Court has

previously determined that Debtor will need a vehicle and that his monthly auto

expenses will be about $515.  The Court notes that Debtor's transportation expenses

are high but he may have few options because of his bankruptcy.

Movant contends that Debtor's expenditure of $400 for food is unreasonable.

Debtor is single and has no dependants.  Movant argues that some of Debtor's food

expense is a result of Debtor's lifestyle of eating out several times each month.

Under the BAPCPA "means test," the standard monthly allowance for food for a one

person household with Debtor's "current monthly income" is $257.[17]  The Court is

persuaded that Debtor's expenditure for food of $400 is excessive.


(5) Whether the debtor's schedules of income and expenditures are reasonable and
accurately reflect the debtor's financial condition.

Debtor testified concerning his current income and expenditures.  The Court is

persuaded that Debtor's amended schedules accurately reflect his actual monthly

income and expenditures.

Movant argues that Debtor's expenditures for housing, transportation, and

---

[17] Under the "means test," Debtor's "current monthly income" is $1,925.  Official
Form 22A, Docket No. 3-1, line 12.

food are not reasonable.  Debtor is single and has no dependants.  The Court is

persuaded that Debtor's housing expense is reasonable.  The Court notes that

Debtor's transportation expense is high but that he may have few options.  The Court

has determined that Debtor's food expense is excessive.

Debtor's amended schedule of current income lists his twenty-one year old

girlfriend as being a dependant.  Movant contends that Debtor's girlfriend does not

live with him and is not dependant on him for support.  Movant contends that some

of Debtor's food expenditures may be a result of his girlfriend.  Debtor testified that

he is single and has no dependants.  The Court is persuaded that Debtor's girlfriend is

not a dependent, and that Debtor may not claim expenses related to her for purposes

of calculating his disposable income.

(6) Whether the debtor's bankruptcy schedules are correct and accurate.

Movant contends that Debtor failed to disclose certain transactions on his

Statement of Financial Affairs.  Debtor did not list the balance transfers of $19,000

between his credit cards on question 3, Payments To Creditors.  Debtor did not list

the re-sale of the diamond ring for $1,200 that he purchased in Cozumel, Mexico, on

question 10, Other Transfers.  The Court is not persuaded that Debtor intentionally

failed to disclose the transfers.

(7) Whether the debtor incurred cash advances and made consumer purchases far exceeding his ability to repay.

Debtor obtained cash advances totaling $2,240 in August of 2006.[18] Debtor made balance transfers totaling some $19,000 between credit cards in July and August of 2006. The balance transfers merely substituted one creditor for another. Debtor made a total of 171 purchases totaling some $18,000 on three credit cards during the four months prior to his filing for bankruptcy relief. Debtor testified that the frequency and type of charges are "historically common behavior" for him. Debtor made his minimum monthly credit card payments from 1996 until September of 2006. Debtor's annual income increased from $16,000 in May of 2006 to $48,000 in August of 2006. Debtor's monthly housing expense increased from $300 to $1,280 during that same time period. Debtor purchased a 2003 BMW for $28,000 in September of 2006. The monthly payments were $700 and auto insurance was $215. Debtor's housing and transportation (without fuel) would consume $2,195 of Debtor's take home pay of $3,221 at his new job at Mount de Sales Academy. The Court is persuaded that Debtor made purchases that far exceeded his ability to repay.

(8) Whether the debtor has a history of prior bankruptcy filings and case dismissals.

The evidence does not show that Debtor has any prior bankruptcy filings.

---

[18] Stipulation of facts, p.16.

19

(9)   Whether the debtor made any efforts to repay his debts or negotiate with creditors.

Debtor testified that he met his credit card obligations from 1996 until September 2006.  Debtor testified that he was never late on a payment and that he made the minimum payments until September of 2006.  Debtor's credit report dated July 30, 2006, lists thirty credit accounts, all in "good standing" with the notations "Never late."  The Court can only conclude that Debtor met his minimum financial obligations until about one month before he filed for bankruptcy relief.

For ten years Debtor made the minimum payments on his ever increasing credit card obligations.  Debtor's annual income increased substantially in August of 2006, just two months prior to his filing for bankruptcy relief.  Debtor now has a much higher salary than when he was accumulating his substantial credit card debt. It would not be fair to allow Debtor to discharge those obligations without him attempting to pay them down.

(10) The debtor's age, health, number of dependants, and family responsibilities.

Debtor is single, has no dependants or health problems, and is about 28 years old.  Debtor is well educated and is currently working on his dissertation for a Ph. D. degree.

(11) Whether the debtor's expenses could be reduced significantly without depriving

him and his dependants of necessities.

The Court has determined that Debtor's food expenditure is excessive, and that Debtor's girlfriend is not a dependant.  The Court is persuaded that Debtor can reduce his expenses without depriving himself of necessities.

(12)   The impact of the bankruptcy filing on the debtor's standard of living.

Debtor's bankruptcy schedules list $94,814 in unsecured obligations.  A Chapter 7 discharge would discharge a considerable amount of Debtor's unsecured obligations.[19]  This debt relief would greatly increase Debtor's standard of living.  In the Court's view, this would not be fair to the credit card companies that financed Debtor's lifestyle for ten years, especially since Debtor recently received a substantial increase in pay.

(13)   The period of time over which the debts were incurred.

Debtor's credit report lists thirty credit accounts.  Twenty of the accounts were opened more than three years before Debtor filed for bankruptcy relief.   Debtor incurred $18,000 in new credit card obligations during the four months prior to filing for bankruptcy relief.  Some $7,000 of these obligations were incurred after Debtor

---

[19] Chase Bank USA, N.A. filed an adversary proceeding contending that Debtor's obligation of $6,300 is non-dischargable in bankruptcy.  The Court expresses no opinion as to the merits of that litigation.  See Adv. No. 07-5006.

21

received his pre-bankruptcy credit counseling.

     Debtor has been living beyond his financial means for some time.  Debtor has been using credit cards to meet his living expenses and to maintain his lifestyle.  The Court is persuaded that it is not fair for Debtor to discharge these obligations in bankruptcy when he has a new job paying a substantially higher salary.

     The Court is persuaded that granting Debtor a discharge would be an abuse of the provisions of Chapter 7 of the Bankruptcy Code.  The Court will enter an order dismissing Debtor's Chapter 7 case unless Debtor converts his case to Chapter 11 or Chapter 13 within ten days of the Court's order.

     An order in accordance with this memorandum opinion will be entered this date.

     DATED this 16th day of July, 2007.


                         /s/ Robert F. Hershner, Jr.
                       ROBERT F. HERSHNER, JR.
                       Chief Judge
                       United States Bankruptcy Court